AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the
Eastern District of Virginia

JAN - 5 2018

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*
Apple iPhone, Model A1778
IMEI: 355331081143968

)
)
)
)
)
)

Case No. 1:18-sw-004

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A (incorporated by reference).

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § § 841, 846 | Possession with the Intent to Distribute Controlled Substances and Conspiracy |

The application is based on these facts:
See attached affidavit of Joseph Davis,  ATF Task Force Officer.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joseph Davis,  ATF Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____01/05/2018_____

_____
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, Virginia

Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

1.      The property to be searched is listed below (hereinafter referred to as "the

Devices").  The Devices are currently located in the ATF Falls Church II evidence locker, which

is located at 7799 Leesburg Pike, Falls Church, Virginia 22043, which is within the Eastern

District of Virginia.  The Devices are listed in the below table.

| Device # | Make | Model | Identifier |
|---|---|---|---|
| 1 | Apple | A1778 iPhone | IMEI: 355331081143968 |
| 2 | Samsung | SM-B311V | MEID HEX: A00000477FDF80 |
| 3 | Samsung | SM-B311V | MEID HEX: A00000476D7C40 |
| 4 | Samsung | SM-B311V | MEID HEX: A0000047761BFC |

2.      The applied-for warrant would authorize the forensic examination of the Devices

for the purpose of identifying electronically stored data particularly described in Attachment B.

# ATTACHMENT B

1.     All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846, and involve MARK KETTER, including:

     a.  Any conversations, whether through text messages or other applications, where KETTER discusses controlled substances;

     b.  lists of customers and related identifying information;

     c.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

     d.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

     e.  any photographs of controlled substances;

     f.  any information recording KETTER's schedule or travel from May 2017 to the date phones came into law enforcement's possession; and

     g.  all bank records, checks, credit card bills, account information, and other financial records.

2.     Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

19

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



JAN - 5 2018

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF | |
| Apple iPhone, Model A1778<br>IMEI: 355331081143968 | |
| CURRENTLY LOCATED AT<br>ATF Falls Church II Evidence Locker<br>7799 Leesburg Pike,<br>Falls Church, Virginia 22043 | 1:18-sw-004 |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Joseph W. Davis, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—

electronic devices—which are currently in law enforcement possession, and the extraction from

those devices of electronically stored information described in Attachment B.

2.     I am a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF"), and have been since 2014.  I am also a sworn Deputy Sheriff with the

Fairfax County Sheriff's Office and have been so since 2003.  I also have experience

investigating narcotics and firearms trafficking offenses as well as searching electronic devices

for evidence of narcotics and firearms trafficking offenses.

3.     Based on my training and experience, and the experience of other law

enforcement officers, in investigating narcotics and the distribution of narcotics while armed, I

know that it is common for individuals engaged in this activity to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities. I know that phones play an integral role in the daily lives of individuals engaging in narcotics trafficking and that these individuals use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephone conversations. I also know that it is common for narcotics traffickers to use multiple phones to communicate with co-conspirators in order to compartmentalize their illegal activity and avoid detection by law enforcement. Further, I know it is common for narcotics traffickers to change their phones and phone numbers in order to avoid detection by law enforcement.

4.      The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from federal and state law enforcement officers, and information obtained from interviews and analysis of reports.

5.      This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.      The property to be searched is listed below (hereinafter referred to as "the Devices"). The Devices are currently located in the ATF Falls Church II evidence locker, which is located at 7799 Leesburg Pike, Falls Church, Virginia 22043, which is within the Eastern District of Virginia. The Devices are listed in the below table.

| Device # | Make | Model | Identifier |
| --- | --- | --- | --- |

2

| 1 | Apple | A1778 iPhone | IMEI: 355331081143968 |
| 2 | Samsung | SM-B311V | MEID HEX: A00000477FDF80 |
| 3 | Samsung | SM-B311V | MEID HEX: A00000476D7C40 |
| 4 | Samsung | SM-B311V | MEID HEX: A0000047761BFC |

7.     The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

A.     Background on the Investigation

8.     In February 2017, a cooperating source ("CS-1") reported to the Prince William County Police Department that Tarvell Vandiver was a narcotics distributor. CS-1 is a member of the Imperial Gangsta Blood ("IGB") gang. CS-1 will be referred to in the masculine gender, regardless of CS-1's true gender. CS-1 has been convicted of two felonies, including robbery and a probation violation. He was arrested in December 2016, in Prince George's County, Maryland, for possessing a stolen firearm as a convicted felon and possession of controlled substances. CS-1 originally cooperated because he hoped to receive a lesser sentence. Based on CS-1's cooperation, Prince George's County dismissed his charges. CS-1 continues to cooperate because he is being compensated. CS-1 also hopes to be relocated.

9.     In March 2017, ATF and the Federal Bureau of Investigation ("FBI") began jointly investigating Blood gang members to include Vandiver and his associates involved in criminal activity in Northern Virginia.

10.     Vandiver is currently charged via criminal complaint with conspiracy to distribute 280 grams or more of cocaine base.

3

B.   Controlled Purchase of Heroin from Mark Ketter on May 25, 2017

11.   On May 24, 2017, CS-1 reported to law enforcement that Vandiver informed CS-1 that he knew a co-conspirator's source for heroin. CS-1 asked Vandiver if he could set up a purchase of two (2) ounces of heroin from the source and Vandiver agreed. Vandiver identified the source as "Tanf." Later, law enforcement determined "Tanf" was actually "Tana." CS-1 incorrectly heard Vandiver say "Tanf."

12.   On May 25, 2017, CS-1, at law enforcement direction, had a FaceTime call with Vandiver. Vandiver asked CS-1 if CS-1 wanted him to call the source (KETTER) and set up a purchase of heroin. CS-1 said yes. During another communication, Vandiver and CS-1 agreed to meet in the evening hours. Vandiver informed CS-1 that he contacted KETTER and that he (Vandiver) would go with CS-1 to meet KETTER.

13.   CS-1 and Vandiver later agreed to meet at the Walmart located at 17401 Jefferson Davis Highway, Dumfries, Virginia, which is in the Eastern District of Virginia, so CS-1 and Vandiver could travel to together to meet KETTER. Prior to the controlled purchase, law enforcement searched CS-1 and his vehicle and found both to be free of illegal contraband. Law enforcement then provided CS-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio and video recorded.

14.   After CS-1 and Vandiver met at the Walmart, Vandiver contacted KETTER via FaceTime while in CS-1's presence to determine the location of the transaction. KETTER instructed Vandiver to come to "A" (Alexandria, Virginia). Vandiver and CS-1 then traveled to Alexandria. KETTER then asked them to meet at the Comfort Inn & Suites located at 5716 South Van Dorn Street in Alexandria. Once CS-1 and Vandiver arrived at the location, KETTER instructed Vandiver and CS-1 to travel to an address on Coverdale Way in Alexandria. Once at

4

the location, law enforcement observed Vandiver exit CS-1's vehicle and enter a gray Dodge

Charger. Law enforcement observed Vandiver exit the gray Charger with a plastic bag. Law

enforcement then observed Vandiver hand the plastic bag to CS-1. CS-1 asked Vandiver how

much he got and Vandiver said "56." Vandiver then rolled down the window and confirmed with

KETTER, who reported it was 56 grams. CS-1, Vandiver, and KETTER discussed the price and

agreed on $2,300 for per ounce.

15.     CS-1 counted out $4,600 in ATF agent cashier funds and provided it to Vandiver.

Vandiver then exited CS-1's vehicle and provided the $4,600 to KETTER. When Vandiver

returned to CS-1 vehicle he had two hats that KETTER provided to him. The hats were reported

to be from KETTER's clothing line.

16.     After the controlled purchased, KETTER departed the area and law enforcement

followed CS-1 and Vandiver to Vandiver's vehicle at the Walmart parking lot, where CS-1

dropped Vandiver off. CS-1 then drove to a meeting location where law enforcement debriefed

CS-1. CS-1 provided law enforcement with the suspected heroin. CS-1 and C1-1's vehicle were

searched for contraband with negative results. The suspected heroin was sent to the Drug

Enforcement Administration ("DEA") Mid-Atlantic Laboratory for testing. The tests confirmed

that the substance weighed 54.31 grams and contained heroin.

C.     Identification of Mark Ketter

17.     After the transaction, law enforcement databases were checked for the registered

owner of the gray Dodge Charger. The vehicle returned to a female at an address in Woodbridge,

Virginia. Law enforcement continued to search databases for the female's known associates.

Based on this search, law enforcement located KETTER in several reports. The Alexandria

Police Department reported they knew KETTER as an area rapper that goes by VA Tana or Tana,

5

and not KETTER.  A photograph of KETTER was obtained from publicly viewed social media websites and compared to surveillance video.  Based on this comparison, law enforcement confirmed KETTER to be "Tana" and the individual who sold Vandiver and CS-1 approximately 56 grams of suspected heroin.

       D.     <u>Controlled Purchase of Heroin from KETTER on June 1, 2017</u>

       18.     On May 25, 2017, Vandiver introduced CS-1 to KETTER.  Vandiver facilitated the purchase of 56 grams of heroin.  In the days leading to June 1, 2017, CS-1 contacted KETTER to arrange the purchase of two additional ounces of heroin.  During a phone call, KETTER told CS-1 that he (KETTER) was in Maryland, he was not willing to travel to Virginia, and that he would meet CS-1 in Maryland.  KETTER and CS-1 agreed to meet in the area of the National Harbor in Oxon Hill, Maryland.

       19.     Prior to the controlled purchase, law enforcement met CS-1 at a staging location and searched CS-1 and his vehicle and found them to be free of illegal contraband.  Law enforcement then provided CS-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio/video recorded.  After departing the staging area, CS-1 contacted KETTER via telephone.  A female answered the phone and explained that the person CS-1 was expecting to speak to left his phone in her car.  The female stated that he (KETTER) was in Alexandria, Virginia, where he (KETTER) thought they were meeting.  CS-1 explained to the female that he and KETTER had agreed to meet in the National Harbor area. The female then stated KETTER would be at the gas station in ten minutes.  Law enforcement set up surveillance in the area of the Sunoco Gas station at the National Harbor.

       20.     Shortly thereafter, law enforcement observed a gray Dodge Charger enter the Sunoco gas station.  KETTER contacted CS-1 and instructed CS-1 to follow his vehicle.

KETTER and CS-1 then drove around the National Harbor area. Law enforcement observed KETTER's vehicle and CS-1's vehicle pull up to the stop sign on American Way at Fleet Street in Oxon Hill, Maryland. KETTER then exited his vehicle, leaving it running in the lane of travel, despite numerous vehicles waiting behind his vehicle. KETTER walked to the passenger door of CS-1's vehicle and opened the door. KETTER then confirmed that CS-1 was providing $4,800 and provided the two (2) ounces of heroin. KETTER stated that during their last deal, he had been shorted money, and was only provided $4,400 when it should have been $4,800. CS-1 explained that $4,800 was provided to Vandiver, who then provided $4,400 to KETTER. KETTER stated that CS-1 would have to make up for the $400 on the next deal.

21.     After the controlled purchased, KETTER departed the area and law enforcement followed CS-1 to a meeting location where law enforcement debriefed CS-1. CS-1 provided law enforcement with the suspected heroin and CS-1 and CS-1's vehicle were searched with negative results. The suspected heroin was sent to the DEA Mid-Atlantic Laboratory for testing. The tests confirmed that the substance weighed 49.49 grams and contained heroin.

E.     Controlled Purchase of Heroin from KETTER on June 15, 2017

22.     On June 15, 2017, CS-1, at law enforcement direction, conducted a controlled purchase of approximately 48 grams of heroin from KETTER. Prior to the controlled purchase, law enforcement met CS-1 at a staging location and searched CS-1 and his vehicle and found them to be free of illegal contraband. Law enforcement then provided CS-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio/video recorded.

23.     CS-1 placed a recorded call to KETTER. KETTER instructed CS-1 to travel to the Tanger Outlets near the MGM Casino (located in Oxon Hill, Maryland) to complete the

7

transaction.  Law enforcement set up surveillance in the area of the Tanger Outlets.  CS-1

departed the staging location and was surveilled by law enforcement in route to the Tanger

outlets.

24.     After arriving at the Tanger Outlets, CS-1 contacted KETTER.  KETTER

instructed CS-1 to leave the parking lot of the Outlets due to the presence of Prince George's

County Police Department vehicles.  KETTER instructed CS-1 to drive around the area of the

Outlets.  After a period of time, KETTER informed CS-1 he was on foot near a roundabout on

Oxon Hill Road just south of the Outlets.  Law enforcement observed KETTER in the area of the

roundabout on foot.  CS-1 took the first right on the roundabout.

25.     Law enforcement observed KETTER approach the passenger side of CS-1's

vehicle.  Audio and Video surveillance captured CS-1 handing U.S. Currency to KETTER.

While KETTER was counting the currency, KETTER stated "I'ma give you 150 cuz its

uhh...47."  KETTER is then observed placing something on the passenger seat of CS-1's vehicle.

26.     After the controlled purchased, KETTER departed the area and law enforcement

followed CS-1 to a meeting location where law enforcement debriefed CS-1.  CS-1 provided law

enforcement with the suspected heroin and CS-1 and CS-1's vehicle was searched with negative

results.  The suspected heroin was sent to the DEA Mid-Atlantic Laboratory for testing.  The tests

confirmed that the substance weighed 46.61 grams and contained heroin.

F.     Controlled Purchase of Heroin from KETTER on November 9, 2017

8

27.     In early November, Vandiver placed CS-1 in contact with KETTER. CS-1 asked

Vandiver to place him in contact with KETTER because CS-1 informed Vandiver that he wanted

to purchase heroin from KETTER. Vandiver then called KETTER via FaceTime, which is a

video application on iPhones, and during this call Vandiver discussed CS-1 purchasing heroin

from KETTER and placed CS-1 on the call.

28.     On November 9, 2017, CS-1, at law enforcement direction, conducted a controlled

purchase of approximately 43 grams of heroin from KETTER. Prior to the transaction, law

enforcement met CS-1 at a staging location and searched CS-1 and his vehicle and found them to

be free of illegal contraband. Law enforcement then provided CS-1 with ATF agent cashier funds

to conduct the controlled purchase. The controlled purchase was also audio/video recorded.

29.     CS-1 placed a recorded call to KETTER. KETTER instructed CS-1 to travel to the

National Harbor (located in Oxon Hill, Maryland) to complete the transaction. Law enforcement

set up surveillance in the area of National Harbor. CS-1 departed the staging location and was

surveilled by law enforcement to National Harbor.

30.     After arriving at National Harbor, KETTER contacted CS-1. KETTER instructed

CS-1 to leave the area of the National Harbor. CS-1 and KETTER briefly discussed a location

within close proximity to National Harbor to conduct the controlled purchase. CS-1 and

KETTER eventually agreed to meet in the parking lot of the Tanger Outlets (located in Oxon Hill,

Maryland). CS-1 departed National Harbor and drove to the Tanger Outlets.

31.     After arriving at the Tanger Outlets, CS-1 told KETTER he parked in the Tanger

Outlet parking lot. Law enforcement then observed KETTER's Dodge Charger traveling in the

Tanger Outlet parking lot. CS-1 told KETTER there were "police" in the parking lot. KETTER

then informed CS-1 that he would not meet him at that location. KETTER then commented to

9

CS-1 that he observed the police in the parking lot. CS-1 then asked KETTER if that was him in the Charger. KETTER replied it was. CS-1 then pulled out of his parking spot and followed KETTER in the Charger to a hotel located a short distance away.

32.     After arriving at the hotel, CS-1 and KETTER parked in the rear parking lot. Law enforcement observed CS-1 and KETTER in the rear parking lot of the hotel. KETTER exited the Charger, walked to CS-1's vehicle, opened the passenger side door, and entered the front passenger seat. KETTER told CS-1 that he had 40 grams of heroin and that it would cost $4,100. KETTER handed CS-1 a clear plastic baggie containing a white powdery substance. In return, CS-1 handed KETTER $4,100 in ATF agent cashier funds. Shortly thereafter, KETTER exited CS-1's vehicle, returned to his vehicle, and departed the area. Law enforcement followed CS-1 to a meeting location where law enforcement debriefed CS-1. CS-1 provided law enforcement with the suspected heroin. CS-1 and CS-1's vehicle were searched with negative results. The suspected was field tested and indicated a positive color reaction for heroin. The suspected heroin had a field weight of 43 grams.

33.     On November 15, 2017, CS-1 was shown a photo of KETTER and positively identified KETTER as the individual from the controlled purchases on May 25, 2017, June 15, 2017, and November 9, 2017.

G.     Arrest of KETTER on December 7, 2017

34.     On or about December 7, 2017, law enforcement located KETTER at 132 West Broad Street Falls Church, Virginia. KETTER was arrested for conspiracy to distribute one-hundred (100) grams or more of heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

35.     Prior to taking KETTER into custody, law enforcement observed KETTER enter his Dodge Charger.  KETTER was then taken into custody while inside his vehicle.  After KETTER was taken into custody, Device 1 was located on KETTER's person.

36.     After KETTER was taken into custody, law enforcement conducted a search of the vehicle.  This search was based on KETTER being a known heroin distributor, using cellular devices to communicate with CS-1 to conduct heroin transactions, KETTER's apparent illness (although later determined at a hospital to be feigned), and that evidence related to the use, distribution, and/or conspiracy to distribute heroin would be found in the vehicle.  Devices 2, 3 and 4 were found in the driver/passenger area of the Dodge Charger.  Prior to the search of the vehicle, law enforcement retrieved and returned all property belonging to the two passengers who were seated inside the Dodge Charger at the time of the arrest.

37.     The Devices are currently in storage at 7799 Leesburg Pike, Falls Church, Virginia 22043, Virginia, which is located within the Eastern District of Virginia.  In my training and experience, I know that the Devices have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state, as they were when the Devices first came into the possession of the ATF.

38.     After a search warrant is obtained for the Devices, ATF or FBI will begin the search of the Devices within the Eastern District of Virginia.  If ATF or FBI cannot complete the search then agents will send the Devices to a private company that specializes in data extraction from Apple iPhones and other electronics.  This private company will either (a) unlock the Devices and then return the Devices to the ATF or FBI office located in the Eastern District of Virginia, where the actual analysis of the contents of the Devices will take place or (b) unlock the Devices and create a forensic image of the Devices, and then return the Devices to the ATF

11

or FBI office located in the Eastern District of Virginia, where the actual analysis of the contents of the Devices will take place.

## TECHNICAL TERMS

39.     Based on my training and experience, I use the following technical terms to convey the following meanings:

     a.   *Wireless telephone*:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include:  storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

     b.   *Digital camera*:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.

12

Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special

13

sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f. *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

14

40.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://www.apple.com/iphone/ and https://www.samsung.com/us/mobile/phones/all-other-phones/sm-b311v-sm-b311vzkpvzw/, I know that the Devices have capabilities that allow them to serve as the following: a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on smart phones can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

41.     In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

42.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

43.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

      a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

15

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

44. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

16

many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

45.     *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

46.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____

Joseph Davis
Task Force Officer
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me on January 5, 2018:

Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

17

## ATTACHMENT A

1.     The property to be searched is listed below (hereinafter referred to as "the Devices").  The Devices are currently located in the ATF Falls Church II evidence locker, which is located at 7799 Leesburg Pike, Falls Church, Virginia 22043, which is within the Eastern District of Virginia.  The Devices are listed in the below table.

| Device # | Make | Model | Identifier |
|----------|------|-------|------------|
| 1 | Apple | A1778 iPhone | IMEI: 355331081143968 |
| 2 | Samsung | SM-B311V | MEID HEX: A00000477FDF80 |
| 3 | Samsung | SM-B311V | MEID HEX: A00000476D7C40 |
| 4 | Samsung | SM-B311V | MEID HEX: A0000047761BFC |

2.     The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

# ATTACHMENT B

1.     All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846, and involve MARK KETTER, including:

   a. Any conversations, whether through text messages or other applications, where KETTER discusses controlled substances;

   b. lists of customers and related identifying information;

   c. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   d. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   e. any photographs of controlled substances;

   f. any information recording KETTER's schedule or travel from May 2017 to the date phones came into law enforcement's possession; and

   g. all bank records, checks, credit card bills, account information, and other financial records.

2.     Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

19